**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MONOTYPE IMAGING, INC. a Delaware corporation (f/k/a/ AGFA MONOTYPE CORP.) and INTERNATIONAL TYPEFACE CORPORATION, a New York corporation, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 03 C 4349 |
| v. | ) ) | |
| BITSTREAM INC., a Delaware corporation, | ) ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

Plaintiffs Monotype Imaging, Inc. ("Monotype") and International Typeface Corporation ("ITC"), (collectively "Plaintiffs"), sued Defendant Bitstream Inc. ("Bitstream") for copyright infringement, trademark infringement, and violation of the Digital Millennium Copyright Act ("DMCA"). The Court held a bench trial on June 20, 2005 through June 27, 2005. For the reasons discussed below, the Court finds that Bitstream is not liable under any of Plaintiffs' claims.

## BACKGROUND

### I.     Procedural Background

Bitstream filed a Motion for Summary Judgment on October 27, 2004. The Court granted summary judgment for Bitstream on Plaintiffs' claims of direct trademark and copyright infringement and vicarious copyright infringement. *Monotype Imaging, Inc. v. Bitstream, Inc.,* No. 03 C 4349, 2005 WL 936882 (N.D. Ill. Apr. 21, 2005). The Court also denied summary

judgment on Plaintiffs' claims for indirect trademark infringement, contributory copyright infringement, and under the DMCA because genuine issues of fact existed.

## II.     Findings Of Fact

### A.     Parties

Monotype is a Delaware corporation with its typographical division located primarily in Elk Grove Village, Illinois, and its principal place of business in Woburn, Massachusetts. (R. 95-1; Pl.'s Proposed Findings of Fact ("PPFF") at ¶ 1.) ITC is a New York corporation that is wholly owned by Monotype and is run by employees of Monotype. (*Id.* ¶ 2.) Monotype is engaged in creation, production, licensing, and distribution of computer software programs which, when used with appropriate hardware and software, generate human readable typeface designs on computer screens, printers, and other output devices. (*Id.* ¶ 6.) These programs are commonly known as "fonts."[1] (*Id.*) Monotype is the owner of approximately 400 fonts. (*Id*) ITC is the owner of the ITC Typeface Library, which contains over 1,500 fonts. (*Id.*) In addition, Monotype and ITC distribute the fonts of other font owners under license from them. (*Id.*)

Bitstream is a Delaware corporation with its principal place of business in Cambridge, Massachusetts. (*Id.* ¶ 3.) Bitstream is a software development company that develops and licenses font software and related font technology software. (R. 95-1; Def.'s Proposed Findings

---

[1]Plaintiffs agree that the "typeface," the design and appearance of the executed "font," is not copyrightable and is not the subject of this litigation. (Tran. 9:9-14.) When the parties referred to the "font," on the other hand, they referred to the underlying computer code, that when used on appropriate hardware and software, generated a human-readable version of the typeface design. Plaintiffs contend that the unauthorized copying of this "font," constitutes copyright infringement. (Tran. 9:22-10:1.)

of Fact ("DPFF") at ¶ 1.)  Bitstream licenses and distributes font software, including over 1,000

fonts that it owns, to equipment manufacturers, software developers and individual users.

Bitstream has licensed and distributed font software since it was founded in 1981.  (*Id.* ¶ 3.)

Bitstream and Monotype directly compete in the field of font software and font technologies.

(*Id.* ¶ 5.)

## II.    TrueDoc

Bitstream developed and licenses a software program and technology called TrueDoc.

(*Id.* ¶ 6.)  Bitstream introduced TrueDoc to the marketplace and made it commercially available

in 1995.  (*Id.*)  The purpose of the TrueDoc technology is to replicate typeface designs regardless

of whether the recipient of a document at a remote location has the same fonts installed on his or

her computer that the creator of the document used.  (*Id.* ¶ 7.)  The TrueDoc software includes a

component called a Character Shape Recorder,[2] which creates a compact file format called a

Portable Font Resource ("PFR") based on an underlying font software program.  (*Id.* ¶ 8.)  As an

example of its use, a PFR file may be transmitted electronically with a document to a recipient

for reproducing typeface designs.  (*Id*) The Character Shape Recorder obtains data that describes

the shape of the typeface characters of the underlying font program from the computer's

operating system, which utilizes the font program.  (*Id.* ¶ 9.)  Bitstream explains this function by

stating that TrueDoc technology "captures the character shapes that result from executing the

fonts."  (*Id.*)  Another component of the TrueDoc software called the Character Shape Player

uses data describing the character shapes in the PFR file to generate images for display or

---

[2]Plaintiffs concede that they do not allege infringement against the TrueDoc software
when it is licensed without the Character Shape Recorder, as is typically the case.  (Tran. 29:5-
17.)

printing on an output device.  (*Id.* ¶ 14.)

### III.    Bitstream's Licensing Of TrueDoc

A Bitstream licensee can use TrueDoc with Bitstream's fonts, as well as with the fonts of other vendors.  (*Id.* ¶ 15.)  Bitstream developed the TrueDoc technology so that it could license it with its own fonts or the fonts of others who allowed their use with the TrueDoc software.  (*Id.* ¶ 16.)  Bitstream did not design its TrueDoc technology with the intent that Bitstream's licensees would use it with Plaintiffs' fonts absent permission.  (*Id.* ¶ 17.)  Each of Bitstream's products containing the TrueDoc technology has been marketed and licensed by Bitstream with Bitstream's fonts, and it has been Bitstream's practice to offer licenses to its own fonts when licensing this technology.  (*Id.* ¶ 18.)  In most cases, Bitstream's current TrueDoc technology includes only pre-created PFR files and the Character Shape Player for displaying the typeface designs stored in the PFR files.  (*Id.* ¶ 20.)  There is no credible evidence of Bitstream's licensees using the TrueDoc technology with any of Plaintiffs' fonts.

### ANALYSIS

### I.    Monotype's Contributory Copyright Infringement Claim[3]

To support a claim for contributory copyright infringement, a plaintiff must demonstrate (1) direct infringement by a primary infringer, (2) the defendant's knowledge of the infringement, and (3) the defendant's material contribution to the infringement.  *Marobie-Fl, Inc. v. National Ass'n of Fire Equip. Distrib. & Northwest Nexus, Inc.,* 983 F.Supp. 1167, 1178 (N.D.

---

[3]Bitstream also argues that Plaintiffs copyright infringement claim should be dismissed because it never alleged that it has registered the asserted copyrights.  Because the Court finds that Plaintiffs have failed to prove their copyright infringement claim, the Court does not reach the issue of whether Plaintiffs failure to allege copyright registration in its pleadings is fatal to its claims at trial.

Ill. 1997) (citing *Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, 264 (9th Cir. 1996)). A

defendant is liable for contributory copyright infringement when it "with knowledge of the

infringing activity, induces, causes, or materially contributes to the infringing conduct of

another." *In re Aimster Copyright Litig.,* 252 F.Supp.2d 634, 649 (N.D. Ill. 2002); *aff'd,* 334

F.3d 643 (7th Cir. 2003).

The capability of substantial noninfringing uses of copying equipment may be a defense

to liability for contributory copyright infringement. *Sony Corp. v. Universal City Studios,* 464

U.S. 417, 442, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). Even with evidence of substantial lawful

use, however, "one who distributes a device with the object of promoting its use to infringe

copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is

liable for the resulting acts of infringement by third parties." *Metro-Goldwyn-Mayer Studios

Inc. v. Grokster, Ltd.,* 125 S.Ct. 2764, No. 04-480, 2005 WL 1499402, *12 (Jun. 27, 2005).

**A.** **Whether Bitstream's Licensees Have Directly Infringed Plaintiffs'
Copyrights**

As a threshold matter, to establish liability for contributory copyright infringement,

Plaintiffs must demonstrate that the licensees of the TrueDoc technology are themselves engaged

in direct copyright infringement of Plaintiffs' copyrighted font software. *See Sony Corp.,* 464

U.S. at 434 (1984) ("To prevail, the [copyright owners] have the burden of proving that users of

the Betamax have infringed their copyrights and that Sony should be held responsible for that

infringement"); *A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1013 n.2 (9th Cir. 2001)

(citations omitted) ("Secondary liability for copyright infringement does not exist in the absence

of direct infringement by a third party").

To make out a claim for direct copyright infringement, a plaintiff must establish that (1)

it owns a copyright for a work and (2) there was unauthorized copying of the elements of the work that are original. *Aimster,* 252 F.Supp.2d at 648.

### 1. Monotype's Ownership Of Its Copyrights

Plaintiffs introduced into evidence Exhibit 24, a certified copy of the registration and statutory deposit for font software identified as Tempus Sans. This registration is prima facie evidence of Plaintiffs' ownership and validity of the copyright in the Tempus Sans font software. *See* 17 U.S.C. § 410(c); *MyWebGrocer, LLC v. Hometown Info, Inc.,* 375 F.3d 190, 192 (2d Cir. 2004).

Plaintiffs also introduced Exhibit 1, a printout of a spreadsheet purporting to indicate the status of various trademarks and copyrights of Plaintiffs. Under cross examination, however, Plaintiffs' witness testified that while he felt that Exhibit 1 was accurate at the time he printed it, he had no idea when he actually printed it. (Tran. 247: 7-248:10.) Further, the witness could not testify as to when the trademarks and copyrights were registered or even whether the trademarks and copyrights were alive or dead either at the time of trial or when the document was printed. (Tran. 249:20 - 268:123.) Accordingly, the Court gives very little weight to Exhibit 1. Plaintiffs have failed to prove ownership of a valid copyright for any mark other than those for which it provided certificates of registration as discussed above.

### 2. Whether There Is Sufficient Evidence Of Direct Infringement

The Court agrees with Bitstream that Plaintiffs have failed to prove that a Bitstream licensee ever used the Character Shape Recorder to copy Plaintiffs' fonts. As alleged evidence of such use, Plaintiffs submitted Exhibits 15 and 17. Exhibit 15 purports to be a tutorial demonstrating the use of Plaintiffs' Tempus Sans font and trademark with TrueDoc. Exhibit 17

purports to be an article providing an example of the use of Plaintiffs' ITC Highlander font and trademark with TrueDoc. Plaintiffs sought to admit into evidence the diagrams contained in Exhibit 15, along with the entirety of Exhibit 17. Plaintiffs do not offer any other evidence related to these exhibits other than the exhibits themselves and the testimony of their expert, Vladimir Levantovksy, who printed the documents from the Internet. In particular, Plaintiffs do not offer any testimony from the purported creators of the websites evidenced by Exhibits 15 and 17.[4] The Court refused to admit Exhibits 15 and 17 for the truth of the matter asserted in them because these exhibits are inadmissible hearsay. The Court admitted Exhibits 15 and 17 only for the limited purpose of proving that the diagrams in those exhibits were displayed on the respective websites on the dates indicated on the exhibits.[5]

The mere presence of Exhibits 15 and 17 on the web does not prove that any licensee used Bitstream's Character Shape Recorder with Plaintiffs' fonts. Indeed, after a full trial, it was plain that Plaintiffs were not arguing that Exhibits 15 and 17, themselves, constituted acts of infringement. Rather, Plaintiffs introduced Exhibits 15 and 17 to demonstrate infringing acts

---

[4]Both in a motion *in limine*, (R. 86-1; Def.'s Mot), and at trial, Bitstream objected to Exhibits 15-17 for lack of authenticity, as inadmissible hearsay, and as irrelevant. The Court denied Bitstream's motion *in limine* without prejudice because it was not clear how Plaintiffs intended to use Exhibits 15 - 17 at trial. At trial, Bitstream renewed its objections. The Court allowed Plaintiffs counsel to question Plaintiffs' expert witness, Vladimir Levantovsky, on the exhibits in order to lay the proper foundation.

[5]The Court does not reach the issue of whether Exhibits 15 and 17 are irrelevant because they evidence alleged infringements that occurred outside the relevant statute of limitations. As discussed in the Court's Order of June 17, 2005, the relevant statute of limitations does not begin to run until the Plaintiff is aware of its cause of action. (R. 101-1; Ct.'s Minute Order of June 17, 2005.) Because the Court finds that Bitstream is not liable under any of Plaintiffs' claims, the Court need not reach Bitstream's laches defense and therefore does not reach the issue of when Plaintiffs became aware of their claims against Bitstream.

that occurred in the creation of those webpages. The mere presence of these documents on their

respective websites does not prove this proposition.[6] Plaintiffs' counsel argued that these

exhibits are similar to crime scene photos, and therefore admissible for this purpose. Adopting

Plaintiffs' counsel's analogy, to the extent crime scene photos would be admissible in a case,

such photos alone typically show the existence of the results of a crime, for instance a dead

body. In order to prove that a murder occurred, the party admitting the crime scene photos

would need additional evidence to link the presence of that body to acts of homicide.

Perhaps recognizing that the Court's limited admission of Exhibits 15 and 17 did not

prove that the alleged underlying acts of infringement took place, Plaintiffs attempted to elicit

testimony from their expert that in his opinion, in order for the graphics of Exhibits 15 and 17 to

exist, infringing acts necessarily must have taken place. Plaintiffs, however, could not point to

any location in Mr. Levantovsky's expert opinion where he had disclosed this opinion, or its

underlying basis, pursuant to Rule 26(a)(2). FED.R.CIV.P. 26(a)(2). Accordingly, the Court

sustains Defendants' objection and strikes Mr. Levantovsky's testimony related to his opinion

that the graphics of Exhibits 15 and 17 demonstrate the infringing acts must have taken place,

---

[6]Exhibits 15 and 17 also lack authentication to the extent they were being offered to show anything more than what was present on the respective websites on the respective dates. While Mr. Levantovsky testified that Exhibits 15 and 17 were true and accurate copies of what was present on those websites at those times, he was not in a position to confirm the authenticity of the actual information on those websites, *i.e.,* the alleged steps taken by an author of the tutorials and the functioning of TrueDoc. Courts have recognized that printouts from websites should be closely scrutinized for reliability. *United States v. Jackson,* 208 F.3d 633, 637 (7th Cir. 2000) ("[A]ny evidence procured off the Internet is adequate for almost nothing, even under the most liberal interpretations of the hearsay exception rules") (quoting *St. Clair v. Johnny's Oyster & Shrimp, Inc.,* 76 F.Supp.2d 773, 775 (S.D. Tex. 1999)).

pursuant to Federal Rule of Civil Procedure 26(a)(2).[7]

Absent any evidence in the record to support the assertion that Exhibits 15 and 17 prove that Bitstream's Character Shape Recorder made copies of Plaintiffs fonts, these exhibits do not establish by a preponderance of the evidence that any direct copyright infringement has occurred.

Besides the web tutorials, Plaintiffs also attempted to prove instances of direct infringement by eliciting testimony about the respective number of Bitstream fonts and non-Bitstream fonts that were available for its customers to use with the Character Shape Recorder. Plaintiffs, however, did not offer any evidence to tie that ratio to the proportion of such fonts that Bitstream's customers actually used with the Character Shape Recorder. For example, while Plaintiffs proved that there are far more non-Bitstream fonts than Bitstream fonts generally available on websites owned by Bitstream, Plaintiffs never proved that the use of fonts with the Character Shape Recorder mirrored that distribution of fonts. Accordingly, Plaintiffs did not prove that a Bitstream licensee ever used any of their fonts with the Character Shape Recorder.[8]

---

[7]In their closing argument, Plaintiffs asserted that Mr. Levantovsky's comparison of fonts was not expert testimony, but rather fact testimony. To the extent Mr. Levantovsky was merely comparing fonts based on his personal experience with those fonts, the Court accepts that testimony as Mr. Levantovky's lay opinion. Nonetheless, based on the nature of the fonts at issue, and Mr. Levantovky's admitted difficulty in viewing the fonts due to the poor quality of the copied exhibits, the Court gives this fact testimony little weight. (Tran. 537:1-538:5.)

[8]Plaintiffs also argued that Bitstream admitted to the alleged direct infringement in its Local Rule 56.1 statement during the summary judgment stage. (Pl.'s Ex. 69A at F28, AF13.) These statements do not constitute admissions on the part of Bitstream. With respect to Bitstream's Fact No. 28, Bitstream is attacking the nature of certain instances that Plaintiffs "point" to. Bitstream is not admitting that those specific instances in fact occurred. Additionally, Plaintiffs' denied this fact and actually pointed out that Bitstream was making an argument, not setting forth a fact. Regarding Bitstream's response to Plaintiffs' Additional Fact No. 13, Bitstream again attacked the nature of the alleged instances. While Bitstream does not

**B.     Whether Bitstream Had Knowledge Of The Infringement**

The knowledge element for contributory copyright infringement is met in those cases where a party has been notified of specific infringing uses of its technology and fails to act to prevent future such infringing uses, or willfully blinds itself to such infringing uses. *Aimster,* 334 F.3d at 650; *Fonovisa,* 76 F.3d at 264.

Initially, the Court notes that Plaintiffs concede that they do not know who allegedly directly infringed their copyrights. (Tran. 773:7-13.) Because Plaintiffs maintain that they have not authorized anyone to use their fonts with Bitstream's Character Shape Recorder, it is true that the identity of the alleged direct infringer may not be necessary to prove the act of direct infringement in this case. For purposes of determining whether Bitstream contributed to that specific direct infringement, however, it is necessary in this case to know generally the identity of the direct infringer. As Bitstream points out, there is no credible[9] evidence in the record for the Court to determine whether or not the specific infringer in Exhibits 15 and 17 was in fact a Bitstream licensee. Accordingly, even if Exhibits 15 and 17 evidenced acts of direct copyright infringement, Plaintiffs failure to prove that Bitstream's licensees committed those acts is fatal to

---

specifically dispute that the instances occurred, there is no indication that Bitstream is admitting that they did. Further, the Court admitted the underlying documents cited by Plaintiffs as supporting their Additional Fact No. 13 for limited purposes. As admitted, those documents, Exhibits 15 and 17, are insufficient to substantiate Plaintiffs' Additional Fact No. 13.

[9]In general, the Court questioned the credibility of Plaintiffs' expert, Vladimir Levantovsky's. The Court bases this finding on the demeanor of Mr. Levantovksy as he testified, (*See e.g,* Tran. 586:22-24; 590:6-13; 597:2-19), his documented involvement and interest in discussing with other potential witnesses how they could answer certain likely questions in this litigation, (*See* Def.'s Ex. 106; Tran. 581:17-584:1), his bias given that he is a Monotype employee and served as Monotype's corporate representative during trial, and the lack of corroborating documentary evidence.

Plaintiffs' claim because there is no evidence that Bitstream contributed to that infringement.

Even if Plaintiffs did prove acts of infringement by Bitstream's licensees, Plaintiff did not present any evidence that Bitstream ever knew that its licensees were using TrueDoc's Character Shape Recorder with Plaintiffs' fonts. Plaintiffs never notified Bitstream of their infringement claims prior to filing this action. In arguing that Bitstream either knew or should have known of the alleged copyright infringement, Plaintiffs rely on numerous statements in Bitstream documents that TrueDoc could be used with any font. (*See e.g,* Ex. 45 at 1.) The Court found the testimony of Bitstream's CEO and General Counsel, Anna Chagnon, and Vice President and Chief Technical Officer, John Collins on this issue to be highly credible. These Bitstream witnesses consistently testified that they never intended Bitstream's licensees to use TrueDoc's Character Shape Recorder with any non-Bitstream font for which the distributor had not granted permission. Ms. Chagnon and Dr. Collins further explained that Bitstream's statements that its licensees could use TrueDoc with any font, reflected the technical capabilities of the software, not how Bitstream intended its licensees to use it. Further, they testified that the reason for indicating that TrueDoc could be used with any font, not just Bitstream fonts, was to entice other font distributors to license their fonts to Bitstream such that those non-Bitstream fonts could be used with TrueDoc. (Tran. 121:6-20; 129:2-9; 131:11-132:6; 134:9-136:2; 658:16-18; 665:6-8; 665:19-666:4.)

C. **The Seventh Circuit's *Aimster* Factors**

The Supreme Court has recognized that a court may impute culpable intent as a matter of law from the characteristics or uses of an accused product. *See Grokster*, 2005 WL 1499401, *12; *Sony Corp.,* 464 U.S. at 434. In determining whether the alleged contributory infringer

acted with such culpable intent, the Seventh Circuit considers: (1) the respective magnitudes of infringing and noninfringing uses; (2) whether the defendant encouraged the infringing uses; and (3) efforts made by the defendant to eliminate or reduce infringing uses.  *Aimster,* 334 F.3d at 649-51.  The Court addresses each of these factors in turn.

### 1.     The Respective Magnitudes Of Infringing And Noninfringing Uses

As discussed in Section I.A.2 of this Analysis, Plaintiffs elicited testimony about the respective number of Bitstream fonts and non-Bitstream fonts available for Bitstream licensees to use with the Character Shape Recorder.  Plaintiffs, however, did not offer any evidence to tie that ratio of Bitstream fonts to non-Bitstream fonts available in the marketplace to the proportion of such fonts that Bitstream's customers actually used with the Character Shape Recorder.  Accordingly, Plaintiffs failed to prove that the infringing uses of the TrueDoc Character Shape Recorder were substantial.[10]  Plaintiffs do not dispute that TrueDoc's Character Shape Recorder can be legally used with Bitstream fonts or with fonts from distributors that have given permission for their fonts to be used with TrueDoc.  Based on the evidence provided at trial, the number of noninfringing uses of the Character Shape Recorder vastly outweighs any potential infringing uses.  This factor heavily favors Bitstream.

### 2.     Whether Defendant Encouraged The Infringing Use

As discussed in Section I.B. of this Analysis, Plaintiff has failed to present any evidence

---

[10]Plaintiffs failed to provide any reliable estimate of the magnitude of infringing uses compared to noninfringing uses of the Character Shape Recorder.  Under Seventh Circuit law, such an estimate is necessary.  *See Aimster,* 334 F.3d at 649 ("What is true is that when a supplier is offering a product or service that has noninfringing as well as infringing uses, some estimate of the respective magnitudes of these uses is necessary for a finding of contributory infringement").

that Bitstream knew of or encouraged the allegedly infringing uses of TrueDoc. While Bitstream

openly advertised that TrueDoc could be used with any font in order to encourage other font

distributors to permit Bitstream's licensees to use TrueDoc with their fonts, Plaintiff has not

presented any credible evidence that Bitstream was in fact encouraging its licensees to use those

non-Bitstream fonts absent such permission.

### 3. Bitstream's Efforts To Eliminate Or Reduce The Infringement

Bitstream has made at least some efforts to reduce the risk of infringement of third

parties' intellectual property through the use of TrueDoc. Bitstream developed a "doc-lock"

feature with the capability of preventing a third party from using a PFR that they receive for any

purpose other than viewing the document with which the PFR came. (Tran. 107:4-8.) Bitstream

also engineered TrueDoc to honor the embedding flags that font foundries include in their font

data, which prohibit a third party from embedding that font into another technology. (Tran.

106:22-107:3.) While Plaintiffs dispute the effectiveness of these technologies and argue that

Bitstream could do more, this argument does not weigh heavily in favor of finding contributory

infringement and certainly does not outweigh the first two factors that decisively weigh in favor

of Bitstream. Balancing the above factors, and especially in light of Plaintiffs' failure to

demonstrate substantial infringing uses of the TrueDoc Character Shape Recorder, Bitstream is

not liable for contributing to the alleged copyright infringement.

### D. The Supreme Court's Decision in *Grokster*

On the day that the parties made their closing arguments to the Court, the Supreme Court

issued its opinion in *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,* 125 S.Ct.2764, No.

04-480, 2005 WL 1499402 (Jun. 27, 2005). The Supreme Court reversed the Ninth Circuit's

decision affirming the district court's grant of summary judgment for the defendants of no liability for contributory copyright infringement. Specifically, the Supreme Court found that the Ninth Circuit had misapplied the *Sony* decision in finding that the defendants' software's capability for noninfringing uses precluded liability for contributory copyright infringement. Adopting the theory of "intentional inducement of infringement" from the field of patent law, *see* 35 U.S.C. § 271(b), the Court held that "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." *Id.*

The Supreme Court's "intentional inducement" theory does not apply to Bitstream's distribution of its TrueDoc software. As discussed above in Section I.B. of this Analysis, Bitstream did not have knowledge of Plaintiffs infringement, let alone act with the "purposeful, culpable expression and conduct" that the Supreme Court found present in the *Grokster* defendants' conduct. *Id.* at *13. The record here is simply devoid of any such evidence. In *Grokster,* the Supreme Court noted three features of the evidence that especially demonstrated the requisite intent. First, the defendants targeted "a known source of demand for copyright infringement, the market comprising former Napster[11] users." Second, neither defendant took any steps to diminish the infringing activity that they knew about. And, third, the defendants' models of business were such that they made money by increasing the volume of use of their software, therefore increasing the volume of infringement.

---

[11]Napster was a competing file-sharing service, prior to it losing its own court fight regarding copyright infringement. *See A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004 (9th Cir. 2001). The district court in *Groskter*, found that the defendants specifically made plans to attract Napster's customer base in the event the courts either shutdown Napster or required it to change it service to avoid copyright infringement. *Grokster, Ltd.,* 2005 WL 1499402.

Here, the most that Plaintiffs can point to are Bitstream's repeated advertisements that its TrueDoc software could be used with any fonts and did not infringe upon intellectual property rights. As several Bitstream witnesses credibly explained, however, the statement that the software could be used with any fonts, referred to the fact that it could work with both Bitstream fonts, as well as fonts from other font distributors that had authorized the use of their fonts with TrueDoc. (Tran. 121:6-20; 129:2-9; 131:11-132:6; 134:9-136:2; 658:16-18; 665:6-8; 665:19-666:4.) This differs substantially from the situation in *Grokster* where the defendants specifically targeted an audience that was seeking to download copyrighted material. Further, unlike in *Grokster,* here, as discussed in Section I.C.3. above, Bitstream submitted evidence that it had taken steps to avoid the use of its TrueDoc with protected fonts of other companies. Lastly, unlike in *Grokster*, there is no evidence in the record to show that Bitstream's business was benefitted by increasing the number of infringing uses of TrueDoc. Instead, the record shows that it was not in Bitstream's business interests to increase any infringement of other parties' fonts using TrueDoc. Rather, by distributing TrueDoc along with Bitstream's own fonts, Bitstream sought to increase sales of its fonts. Accordingly, there is no evidence in the record[12] that supports that Bitstream acted with the requisite intent to make it liable under *Grokster's* intentional inducement of infringement cause of action.[13]

_____

[12]The finding of no intent to induce infringement is especially appropriate here after a full bench trial. In *Grokster*, the Supreme Court was analyzing the evidence in the light most favorable to the defendants to determine whether the evidence of intent was sufficient to survive defendants' motion for summary judgment of no liability.

[13]To the extent Plaintiffs argue that Bitstream should have known of the alleged infringing uses of TrueDoc and therefore had constructive knowledge of such infringement, the Supreme Court expressly exempted such a state of mind from its intentional inducement cause of action. *Grokster,* 2005 WL 1499402, at *13 ("mere knowledge of infringing potential or of

**II.     Monotype's Contributory Trademark Infringement Claim**

To prove contributory trademark infringement, a plaintiff must demonstrate that a defendant: (1) intentionally induced a third party to infringe the plaintiff's mark; or (2) supplied a product to a third party with actual or constructive knowledge that the product was being used to directly infringe the mark. *Imwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 854 (1982); *Hard Rock Café Licensing Corp. v. Concession Servs., Inc.,* 955 F.2d 1143, 1148 (7th Cir. 1992); *SB Designs v. Reebok Int'l, Ltd.,* 338 F.Supp.2d 904, 911-12 (N.D. Ill. 2004). Contributory infringement requires proof of direct infringement by a third party, as well as the defendant's intent and knowledge of the wrongful activities of its distributors. *David Berg & Co. v. Gatto Int'l Trading Co., Inc.,* 884 F.2d 306, 311 (7th Cir. 1989).

**A.     Whether Bitstream's Licensees Have Directly Infringed Plaintiffs' Trademarks**

To make out a claim for direct trademark infringement under the Lanham Act, a plaintiff must establish that (1) its mark is protectable and (2) the defendant's use of the mark is likely to cause confusion among consumers. *See CAE, Inc. v. Clean Air Eng'g, Inc.,* 267 F.3d 660, 673-74 (7th Cir. 2001) (citing *Eli Lilly & Co. v. Natural Answers, Inc.,* 223 F.3d 456, 461 (7th Cir. 2000); *Smith Fiberglass Prod., Inc. v. Ameron, Inc.,* 7 F.3d 1327, 1329 (7th Cir. 1993)). The Seventh Circuit applies a seven-factor test to determine likelihood of confusion, including (1) the similarity of the marks; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be used by consumers; (5) the strength of the plaintiffs' mark; (6) whether any actual confusion exists; and (7) the defendant's intent to palm off its

_____

actual infringing uses would not be enough here to subject a distributor to liability".)

goods as those of the plaintiffs. *Promatek Indus., Ltd. v. Equitrac Corp.,* 300 F.3d 808, 812 (7th Cir. 2002). The likelihood of confusion test is an equitable balancing test; no single factor is dispositive and courts may assign varying weights to each of the factors depending on the facts presented. *CAE,* 267 F.3d at 678 (citing *Barbecue Marx, Inc. v. 551 Ogden, Inc.* 235 F.3d 1041, 1044 (7th Cir. 2000)). The Seventh Circuit has recognized, however, that the similarity of the marks, the defendant's intent, and actual confusion are the "most important" factors. *Id.* At 686 (citing *Eli Lilly,* 233 F.3d at 462).

### 1.    Plaintiffs' Ownership Of A Protectable Mark

At trial, Plaintiffs introduced into evidence the federal registrations for various trademarks, including "ITC HIGHLANDER," registered on April 25, 1995 (Ex. 32).[14] The Court presumes that Plaintiffs' registered marks are properly owned and valid. 15 U.S.C. § 1057(b) (providing that a certificate of registration is prima facie evidence that the registrant owns the mark and that the mark is valid). As discussed in Section I.A.1 in this Analysis, the Court gives little weight to Exhibit 1 and Plaintiffs failed to prove ownership of a valid trademark for any mark other than those for which it provided certificates of registration.

### 2.    Whether There Is Evidence That Bitstream's Licensees Ever Used Plaintiffs' Fonts With The Character Shape Recorder

As discussed in Section I.A.2. in this Analysis, there is no evidence in the record that Bitstream's licensees ever used Plaintiffs' fonts with TrueDoc's Character Shape Recorder. The

---

[14]The other trademarks for which Plaintiffs provided federal registrations were: ITC TEMPUS, registered June 11, 2002 (Ex. 25), TEMPUS, registered September 10, 2002 (Ex. 26), ITC MENDOZA ROMAN (Ex. 28), March 23, 1993, GALLIARD, registered July 15, 2003 (Ex. 29), ITC SLIMBACH, registered February 7, 1989 (Ex. 30), and ITC USHERWOOD, registered April 22, 1986 (Ex. 31).

Court recognizes that the limited purposes for which it admitted Exhibits 15 and 17 into evidence impact the copyright and trademark analyses differently. For instance, Plaintiffs would require the Court to accept those exhibits for the truth of the matter asserted in order for those documents to evidence that the author of those websites used TrueDoc to create a PFR of one of Plaintiffs' fonts. On the other hand, the Court does not need to accept those exhibits for their truth in order for those exhibits to evidence that Plaintiffs' marks were present on the respective websites on the dates that Mr. Levontovsky printed them from his computer. This evidence, however, does not prove that trademark infringement occurred. The mere presence of these marks on the Internet does not demonstrate how the marks were being used and, in particular, whether they were being used in association with any particular product or service. Absent any evidence of how the authors of Exhibits 15 and 17 used Plaintiffs' marks, Plaintiffs have failed to meet their burden of proving a likelihood of confusion. With respect to the alleged uses of Plaintiffs' trademarks in Exhibits 15 and 17, there is no evidence related to the majority of the Seventh Circuit's likelihood of confusion factors. *Promatek Indus.,* 300 F.3d at 812.[15] Accordingly, Plaintiffs have failed to prove any instances of direct infringement of Plaintiffs' trademarks.[16]

---

[15]In particular, without evidence of how the authors of Exhibits 15 and 17 were using the marks, there is no evidence of the similarity of the products, the area and manner of concurrent use, the degree of care likely to be used by consumers, actual confusion, or defendant's intent to palm off its good as those of the plaintiffs. Balancing the factors, there is no likelihood of confusion in the specific uses allegedly evidenced in Exhibits 15 and 17.

[16]Also as discussed in Section I.A.2 in this Analysis, to the extent Plaintiffs seek to prove direct trademark infringement by proving the relative proportion of non-Bitstream and Bitstream fonts available on the market, Plaintiffs failed to tie that relationship to that of the fonts actually used with the Character Shape Recorder.

Plaintiffs also introduced testimony from Mr. Levantovsky that he used certain Corel products containing TrueDoc along with Plaintiffs' fonts. (Tran. 558-563.) This testimony, however, was outside the scope of Mr. Levantovksy's expert report and the Court only admitted such testimony as fact testimony. Given the nature of Mr. Levantovsky's testimony, as discussed in footnotes 7 and 9 above, the Court gives little weight to this evidence. Further, while Mr. Levantovksy testified that the "name of the font that is used is readily available and accessible by the user" on Corel's Word Perfect software, he did not identify, nor did Plaintiffs submit any evidence, to show the appearance of the font name. (Tran. 559:16- 560:19.) Absent any other specific evidence, the Court cannot find that the font name is likely to cause consumer confusion.[17]

**B.      Whether Bistream Intentionally Induced Its Licensees' Infringement**

Alternatively, even if Exhibits 15 or 17 did evidence instances of direct infringement of Plaintiffs' trademarks, Plaintiffs failed to prove that those exhibits evidence infringements by Bitsream's licensees. Absent any evidence of the party committing the alleged direct infringements in Exhibits 15 and 17, there is no evidence of any relationship between Bitstream and the alleged infringer and therefore no evidence of Bitstream's contribution to or inducement of that infringement.

Additionally, regarding Mr. Levantovksy's alleged viewing of Plaintiffs' font names on Corel's Word Perfect, Plaintiffs never submitted any evidence that Bitstream licensed the specific use of Plaintiffs' font names on Word Perfect. While Plaintiffs introduced testimony

---

[17]Plaintiffs did not offer any evidence from third parties such as Corel. There is also no evidence that Plaintiffs ever even attempted to seek discovery from third parties such as Corel.

from Ms. Chagnon that Bitstream licensed TrueDoc to Corel, she also plainly explained that she was not sure which specific Corel programs were included in that license. (Tran. 177:9-179:9.) In particular, Ms. Chagnon was uncertain whether TrueDoc was incorporated into Word Perfect. (*Id.*) Therefore, even if Corel's Word Perfect does display Plaintiffs' font names, there is no credible evidence that Corel did so under a license from Bitstream. Absent such evidence, Plaintiffs have not proven that Bitstream in any way contributed to or induced any direct infringement.

Furthermore, even assuming that Bitstream's licensees were infringing Plaintiffs' trademarks, Plaintiffs failed to prove that Bitstream either intentionally induced its licensees to infringe Plaintiffs' marks or that it licensed TrueDoc with actual or constructive knowledge that its licensees were using it to infringe Plaintiffs' marks. *See Imwood Labs.,* 456 U.S. at 854-55.[18] Analyzing Bitstream's conduct related to its licensees' alleged use of Plaintiffs' trademarks demonstrates that Bitstream is not liable for such infringement. As discussed above in Section I.B. and I.D., Plaintiffs rely on numerous statements in Bitstream documents that TrueDoc could be used with any font. (*See e.g,* Ex. 45 at 1.) The credible testimony of Anna Chagnon and John Collins explained that these statements reflected the technical capabilities of the software, not how Bitstream intended its licensees to use it. The reason for indicating that TrueDoc could be used with any font, not just Bitstream fonts, was to entice other font distributors to license their

---

[18]Indeed, in *Sony*, the Supreme Court recognized that the doctrine of indirect trademark infringement was more narrow than the doctrine of contributory copyright infringement. *See Sony,* 464 U.S. at 439, n.19. Therefore, given that the Court has found that Bitstream is not liable for contributory infringement of Plaintiffs copyrighted font software, it is unlikely that Bitstream could simultaneously be liable for contributorily infringing Plaintiffs trademarks associated with that font software. *Id.*

fonts to Bitstream such that those non-Bitstream fonts could be used with TrueDoc. (Tran. 121:6-20; 129:2-9; 131:11-132:6; 134:9-136:2; 658:16-18; 665:6-8; 665:19-666:4.)

## III.    Monotype's DMCA Claim

17 U.S.C. § 1202(b) concerns the removal or alteration of copyright management information without the authority of the copyright owner or the law. Copyright management information includes "the information set forth in a notice of copyright." 17 U.S.C. § 1202(c). Section 1202(b) provides:

> No person shall, without the authority of the copyright owner or the law –
> (1) intentionally remove or alter any copyright management information,
> []
> (3) distribute ... copies of works ... knowing that copyright management information has been removed or altered without authority of the copyright owner or the law,
> knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

17 U.S.C. § 1202(b). Section 1202(b)(1) applies only to the removal of copyright management information on (or from) a plaintiff's product or original work. *Kelly v. Arriba Soft Corp.,* 77 F.Supp.2d 1116, 1122 (C.D. Cal. 1999); *aff'd in part, rev'd in part,* 280 F.3d 934 (9th Cir. 2002).

### A.    Section 1202(b)(1)

As discussed in Section I.A.2. of this Analysis, Plaintiffs have failed to show that Bitstream's licensees have used the Character Shape Recorder with any of Plaintiffs' fonts. Therefore, Plaintiffs have failed to show that Bitstream, or any of its licensees, "intentionally remove[d] or alter[ed] any copyright management information [] knowing, or, [] having reasonable grounds to know that it will induce, enable, facilitate or conceal an infringement of any right under this title." *See* 17 U.S.C. § 1202(b). Moreover, as discussed above in Section

I.B of this Analysis, even if Bitstream's licensees did use TrueDoc with Plaintiffs' fonts, there is no evidence that Bitstream knowingly or intentionally contributed to such use.

**B.       Section 1202(b)(3)**

As with the Section 1202(b)(3) analysis, because Plaintiffs have failed to show that Bitstream's licensees have used the Character Shape Recorder with any of Plaintiffs' fonts, Plaintiffs have failed to show that Bitstream, or its licensees, have "distribute[d].... copies of works .... knowing that copyright management information has been removed or altered without authority of the copyright owner or the law [and] knowing, or, [] having reasonable grounds to know, that it will induce, enable, or facilitate, or conceal an infringement of any right under this title."  *See* 17 U.S.C. § 1202(b)(3).   Further, as discussed above in Section I.B of this Analysis, even if Bitstream's licensees did use TrueDoc with Plaintiffs' fonts, there is no evidence that Bitstream knowingly or intentionally contributed to such use.

**CONCLUSION**

For the reasons discussed above, Bitstream is not liable under any of Plaintiffs' claims of contributory copyright infringement, contributory trademark infringement, or infringement under the DMCA. Because the Court finds that Bitstream is not liable under any of Plaintiffs' claims, the Court denies as moot Bistream's motion to dismiss Plaintiffs' copyright claim and its motion for judgment on partial findings.


Dated: July 12, 2005                                    ENTERED:


                                                       _____
                                                       AMY J. ST. EVE
                                                       United States District Court Judge